406 So.2d 657 (1981)
SOUTHERN NATURAL GAS COMPANY, Plaintiff-Appellee,
v.
Billie J. Cummings POLAND, et al.
Charles Wesley JORDAN, et al.
William Travis LOWREY, et al.
William Travis LOWREY, et al.
Steven W. SUTTON, et al.
Elmer D. WALKER, et al.
Glenn C. LOWREY, et al.
Grace PRUITT.
Larry C. SUTTON, et al.
Bill C. SUTTON, et al., Defendants-Appellants.
Nos. 14670-14679.
Court of Appeal of Louisiana, Second Circuit.
November 2, 1981.
Rehearing Denied December 10, 1981.
*659 Bobby L. Culpepper, Jonesboro, Hal R. Henderson, Arcadia, for defendants-appellants.
Liskow & Lewis, by Robert T. Jorden, John M. Wilson & Frederick W. Bradley, New Orleans, for plaintiff-appellee.
Before PRICE, HALL and MARVIN, JJ.
En Banc. Rehearing Denied December 10, 1981.
MARVIN, Judge.
In these nine appeals in ten consolidated actions under LRS 19:2(5), the judgments expropriated from the several defendants their respective rights in and above an underground reservoir for the storage of natural gas, fixed compensation to be paid for those rights, and in six cases, cast plaintiff Southern Natural with costs and attorney fees incurred by defendants.[1]
In 12 assignments of error in these appeals, defendants question the constitutionality of the expropriation statutes and whether the statutory requirements for expropriation were met by Southern Natural. Alternatively, defendants seek to increase the amount awarded as compensation. Southern Natural's answer in six appeals seeks to amend the judgments where Southern Natural was cast for costs and attorney fees. We amend and affirm.

PREFACE

THE CONSTITUTIONAL AND STATUTORY REQUIREMENTS
LSA-Constn. Art. 1, § 4, expressly provides that the right of a person to own and enjoy private property is subject to the reasonable exercise of police power and that for a public and necessary purpose, with just compensation paid to the owner, private property may be expropriated by a private entity authorized by law to expropriate.
LRS 19:2(5) provides that if a price cannot be agreed on with the owner of property [after good faith negotiation], the needed property may be expropriated by any domestic or foreign corporation created for the piping and marketing of natural gas for the purpose of supplying the public with natural gas. In a later enacted statute, LRS 30:22, the legislature has declared that the underground storage and reservation of large quantities of natural gas, for orderly withdrawal in periods of peak demand by the consumer, is in the public interest and public purpose.
LRS 30:22 requires any person, prior to and as a condition precedent to exercising the power to expropriate any underground reservoir for the storage of natural gas, to obtain the express approval of the Commissioner of Conservation. Under this statute, the Commissioner is required to give notice to the persons affected by the expropriation, hold hearings and to determine
that the reservoir is suitable and feasible for the purpose;
that no reservoir which is capable of producing oil in paying quantities shall be used for storage purposes unless such reservoir has a greater value for storage than the production of the remaining volumes of original reservoir natural gas and condensate, and at least 3/4ths of the owners in interest, exclusive of any "lessor" defined in LRS 41:1261, have consented to such use in writing,
that the storage will not contaminate other formations containing fresh water, oil, gas, or other commercial mineral deposits, and
that the storage will not endanger lives or property. *660 The Commissioner is also required to determine the amount of the original commercially recoverable gas and condensate remaining in the reservoir, if any. See LRS 30:22(B) and (C).
The Commissioner's order may be appealed or challenged in judicial proceedings at the Commissioner's domicile in East Baton Rouge Parish. When final, the Commissioner's order shall be taken as prima facie valid and may not be collaterally attacked. LRS 30:12. Interstate Oil Pipe Line Co. v. Guilbeau, 217 La. 160, 46 So.2d 113 (1950); Brown v. Alice-Sydney Oil Co., 343 So.2d 745 (La.App. 2d Cir. 1977).
Natural gas marketing companies do not enjoy quick-taking expropriation power such as is enjoyed by the Department of Highways, but must first establish in an expropriation action, the public and necessary purpose to be served by the expropriation (LSA-Constn. Art. 1, § 4), the approval of the Commissioner of Conservation (LRS 30:22(B)), and that good faith negotiation has been conducted with the owner for acquisition of the property (LRS 19:2(5)). After these prerequisites have been established the amount of just compensation under LSA Constn. Art. 1, § 4, is to be judicially determined. Compare LRS 48:441 and LRS 19:2 et seq.
Obviously in an effort to expedite a Title 19 expropriation, the legislature requires that a defendant file all of his defenses within 15 days after he has been served with notice of the trial date. This requirement prevents a defendant from raising defenses piecemeal and protracting the litigation. LRS 19:6, 7.
Southern Natural filed 75 suits in 1979 for expropriation in this project in the Bear Creek field in Bienville Parish, only 15 of which remained pending for trial in September 1980. Earlier in 1980 in appeals in nine cases, we noted that the trial court had found the requisite good faith negotiation, the approval of the Commissioner, and the necessary and public purpose of the project. Southern Natural Gas Co. v. Poland, 384 So.2d 528 (La.App.2d Cir. 1980). Writs were denied by the Louisiana Supreme Court. 386 So.2d 363 (La.1980).
Thereafter, and shortly before the September 1980 trial date, in nine of the cases here appealed, defendants-appellants filed exceptions, pleas of unconstitutionality, and motions to continue the trial. The trial court dismissed the suits on an exception which attacked the Commissioner's order approving the storage of gas in the reservoir, but did not rule on the plea of constitutionality or on the motion for continuance. We granted supervisory writs, reversed the trial court, overruled the exception attacking the Commissioner's order and remanded the cases for trial on September 10, 1980, stating in an unpublished order on September 8, 1980:
"Even if these exceptions were timely filed and [even] if Bienville Parish is a parish of proper venue in which to question the sufficiency of an Order of the Commissioner of Conservation (which questions we do not now reach), we find the Order of the Commissioner of April 20, 1979, to be in compliance with LRS 30:22."
The Louisiana Supreme Court upheld this order by denying an application for review of this order. 380 So.2d 80 (La.1980). The trial court then denied a continuance and these cases proceeded to trial.
After a five day trial on the taking issue, the trial court found that the proposed expropriation was for a public and necessary purpose, that Southern Natural was a corporation authorized to expropriate and had obtained the proper order or orders giving the approval of the Commissioner of Conservation, and that Southern Natural had negotiated in good faith with the owners before petitioning for expropriation. After this ruling the compensation issue was tried and determined by the court.

ASSIGNMENTS OF ERROR 1-6
Appellants continue their attack on the Commissioner's order in assignments 1 and 2, arguing, among other things, that the reservoir in question is capable of producing oil in paying quantities, that Southern Natural is not a prudent operator, that Southern *661 Natural knowingly presented false information to the Commissioner and acted fraudulently and unfairly to obtain the Commissioner's order, and in respect to acquiring property rights in and above the reservoir, Southern Natural has attempted "to take ... through coercion, fright and deceit." In essence, appellants seek that we reverse the judgments ordering expropriation on the grounds that the Commissioner's order is invalid and not in compliance with the statute.
An order of the Commissioner of Conservation is not sacrosanct and may be attacked on any grounds in a hearing called for that purpose before the Commissioner. Any interested person has the right to have the Commissioner call a hearing for the purpose of taking action on a matter within his jurisdiction and the Commissioner is required to promptly call a hearing. LRS 30:6(F). An interested person affected by an order of the Commissioner may obtain judicial and summary review of the Commissioner's order by filing suit at the Commissioner's domicile in East Baton Rouge Parish. LRS 30:12.[2]
Courts have consistently upheld these legislative limitations as to where review of the Commissioner's order may be obtained. Interstate Oil Pipe Line Co. v. Guilbeau, supra; Brown v. Alice-Sydney Oil Co., supra; Theriot v. Mermentau Resources, Inc., 385 So.2d 939 (La.App. 3d Cir. 1980). Until the order of the Commissioner is modified or annulled as the legislature directs, the order is prima facie valid and is not subject to collateral attack. The legislature simply has not given the Bienville Parish District Court or this court the jurisdictional authority to adjudge invalid an order of the Commissioner of Conservation. That authority has been given to the courts having geographical jurisdiction in East Baton Rouge Parish, the domicile of the Commissioner of Conservation.
Thus, any question as to the validity or correctness of the determinations that the legislature has required the Commissioner to make in LRS 30:22(B), must be raised in a direct proceeding either before the Commissioner or against the Commissioner in a judicial proceeding at his domicile. Assignments 1 and 2 present no error. We note that most of the § 22 determinations the legislature has required the Commissioner to make require the technical expertise of geologists, engineers and other experts available to the Conservation Commission which is generally charged by the legislature with the great public duty of monitoring the natural resources of the state.
The legislature has also required that expropriation actions under LSA-Constn. Art. 1, § 4 and LRS 19:2(5) be instituted in the district court of the parish where the property is located and that certain prerequisites be established to the satisfaction of the court before expropriation may be ordered. The first prerequisite is that the expropriator shall have obtained the express approval of the Commissioner of Conservation for using an underground reservoir for natural gas storage purposes. The second is that the expropriator shall have negotiated with the owner to acquire the right to store natural gas in the reservoir. Courts have added the requirement that this negotiation must have been "good faith" negotiation. Once the court is satisfied that these prerequisites have been met, the court is constitutionally required to make the determination whether the expropriation is for a public and necessary purpose, and, if so, to determine just compensation for the property right that is ordered expropriated.
Appellants assert in assignment 3 that the bodies of the two statutes in question are broader than their titles and are in conflict with the constitutional requirement *662 that the public and necessary purpose of the expropriation is to be judicially determined. The first argument of broadness was squarely presented in Mid-Louisiana Gas Co. v. Sanchez, 280 So.2d 406 (La.App. 4th Cir. 1973), writs denied, and the statutes were held constitutional. When writs were denied in that case by the Louisiana Supreme Court in 1973, the issue of these expropriation statutes being unconstitutional because of broadness beyond title was resolved.
The second constitutional argument, also presented in assignments 4 and 6, questions whether there was a judicial determination that the storage of natural gas in the Bear Creek reservoir is for a public and necessary purpose. The fact that the legislature has declared public policy in LRS 30:22(A) and has required the Commissioner of Conservation to hold hearings and make similar findings of public necessity and purpose, does not relieve the trial court of its constitutional duty of making the eventual determination. The constitution does not forbid the legislature from adding reasonable statutory prerequisites for expropriation that are obviously designed for the protection of the public and the fulfillment of the constitutional mandate of public purpose and necessity. LSA-Constn. Art. 1, § 4. Findings and orders of public administrative agencies may be considered as evidence in a judicial proceeding for the purpose of determining public and necessary purpose. See Texas Eastern Transmission Corporation v. Bowman, 238 La. 399, 115 So.2d 797 (1959); United Gas Pipe Line Company v. Landry, 228 So.2d 565 (La.App. 1st Cir. 1969).
In addition to evidence of the findings and orders of the federal and state agencies here involved, Southern Natural produced direct testimony about the storage project and its function from one of its engineers, who is a 32-year employee and an assistant vice president of the company. Southern Natural produces and sells gas to gas companies who then further distribute and resell the gas to the individual consumer, usually in interstate commerce. These companies and Southern Natural are regulated by governmental agencies because of their public utility function.
During slack periods of consumer demand, natural gas would be injected into the reservoir. During peak periods of demand this gas would be released into the pipeline for eventual consumer use when the normal supply of gas from producing wells is not sufficient to meet the peak demand. This witness also testified that the storage of natural gas in the porous rock of essentially depleted reservoirs is an efficient, economic, and proven way to better meet the peak demand for gas by the public, and that the Bear Creek reservoir is such an essentially depleted reservoir of adequate size and character to accomplish this purpose. The trial court referred to this testimony and to the public agency findings and orders as the basis for determining that the expropriation was for a public and necessary purpose.
Appellants did not offer evidence to contradict this evidence and the trial court made its determination of public and necessary purpose on the basis of uncontradicted evidence and testimony. We find no evidentiary foundation in this record for appellants' allegations that the trial court "rubber stamped" the findings of the governmental agencies.
Assignments 3, 4, and 6 present no error.
The fifth assignment is that the trial court erred in determining that Southern Natural had negotiated with defendants (LRS 19:2), in good faith (Dixie Pipeline Company v. Barry, 227 So.2d 1 (La.App. 3d Cir. 1969), writ refused). This determination can only be made on the circumstances of the individual case and essentially calls for a factual determination by the trial court that is entitled to great weight on appeal. Dixie Electric Membership Corporation v. Watts, 268 So.2d 128 (La.App. 1st Cir. 1972); Southwest La. Elec. Membership Corp. v. Lemon, 338 So.2d 367 (La.App. 3d Cir. 1976), writ refused.
Southern Natural's agents testified about negotiating with these defendants and that *663 they kept daily logs of the contacts made with these defendants beginning in 1978. The logs were introduced into evidence.[3] In addition to these contacts by telephone and in person, plaintiff sent defendants certified letters inviting negotiation. Where the petitioner for expropriation shows contacts with an owner prima facially indicating good faith negotiation, the owner must introduce circumstances to overcome this prima facie indication. See Dakin and Klein, Eminent Domain in Louisiana, p. 301 (1970).
The statute requires negotiation as a prerequisite to bringing suit for expropriation. Before the suit was brought in 1979 it was not necessary that negotiations for community property rights be conducted with both the husband and wife. The husband, as the head and master, could bind the community. Appellants have not overcome the prima facie indication that plaintiff's negotiation, however fruitless, was other than in good faith. Substantial evidence supports the trial court's determination of good faith negotiation and assignment 5 presents no error.

JUST COMPENSATION
The determination of what amount will compensate the owner of a property right to the full extent of his loss because of expropriation of the right must be made on the basis of the facts of each case and in accord with the uniqueness of the thing taken. Trunkline Gas Co. v. Rawls, 394 So.2d 1250 (La.App. 2d Cir. 1981).
Compensation is payable for the value of the recoverable natural gas and condensate remaining in the reservoir, the value of the underground storage right, and the value of the servitude rights on the surface. The unrecoverable gas in the reservoir may be considered as an element or factor in determining the value of the storage *664 right. Mid-Louisiana Gas Company v. Sanchez, supra.
The trial court accepted Southern Natural's expert testimony and found the amount of recoverable gas and condensate to be the amount shown in the Commissioner's order, less the amount that was shown to have been produced since November 1, 1978. The fair market value of recoverable gas and condensate was determined from the testimony of another expert who allowed a 20 month production time and applied a reasonable discount to reach a present value for the gas and condensate. The price of gas was based on the ceiling set by the Federal Energy Regulatory Commission, the government agency that sets the price of interstate gas. Condensate was based on market price per barrel. Defendants offered no expert testimony as to the value of the recoverable gas and condensate, but presented a geologist who testified that there was a "possibility" that there was more gas and condensate in the reservoir(s) than had been represented to the Commissioner and to the court.
The court determined the surface value and reservoir value from plaintiff's expert who used the market data, comparable sales, approach. The highest and best use of the surface was found to be for the production of timber, except that some tracts were better suited for rural homesites or pasture. Timber was appraised by other appraisers. Plaintiff's expert used 41 comparable sales as a basis for his appraisal. These sales occurred prior to the Commissioner's order. Defendants' appraiser based his appraisal on one sale (called the Enterprise sale) he contended was comparable but which he had not "verified". The court accepted the defendants' witness as an expert appraiser, but rejected his appraisal because it was based only on this one comparable. The court accepted the estimate of the quantity of timber on one tract that was made by defendants' expert. The court accepted the higher appraisal of plaintiff's expert as to the unit value of the timber to reach the total value of the timber on that tract.
The court determined the value of the storage right on the basis of expert testimony offered by plaintiff's appraiser, whose testimony had also been accepted by the court as the basis for the court's determination of the value of the surface rights. This appraiser analyzed sales of storage rights by 177 owners in the Bear Creek field, all of which had been made before expropriation suits were filed. These sales revealed an average price of $222 per acre, and included five sales where the seller was considered as knowledgeable as the purchaser about the method of determining the value of the storage right. This group was paid prices ranging from $187 to $205 per acre for the storage right. Plaintiff's appraiser and appraisers for sellers in this group were familiar with and utilized the appraisal approach approved in the 1973 case of Mid-Louisiana Gas Co. v. Sanchez, cited supra.
In this group of knowledgeable sellers was Continental Group, Inc., which owned 3900 acres, constituting 30 percent of the total acreage needed for the storage right. Continental knew that unless it sold its storage right to plaintiff, plaintiff could not have exercised the statutory expropriation power, and to this extent, Continental was in much better bargaining position than was plaintiff. Continental had the services of two attorneys and two geologists, one of which had been an appraiser for the property owners in the 1973 Sanchez case. Continental's executive vice president, who conducted the negotiations for Continental, testified that he knew that Southern Natural could not expropriate Continental's property rights, that Continental was represented by competent experts, and that Continental's decision to sell its storage rights was made on the basis that it was preferred to make the best bargain possible to sell the storage rights over continuing to own its interest in what would have been eventually an empty and essentially worthless underground reservoir. Continental was paid $195.38 per acre for its storage rights.

THE SANCHEZ DECISION
Defendants' assignment 7 complains that the trial court erred in interpreting the *665 Sanchez decision. Sanchez expressly rejected the argument that the value of the storage right should be determined by what it would cost to replace the unrecoverable gas in the underground reservoir. Sanchez held that market value, comparable sales, was the method by which the value of the storage right should be determined and that the presence of unrecoverable gas in the reservoir was a factor or an element which could be used to determine the value of the reservoir to be used for storage purposes. This was the approach taken by plaintiff's appraiser and the trial court and we find no error in assignment 7.

THE ENTERPRISE SALE
In 1976, Enterprise Products Company purchased 174 acres, subject to timber and minerals being reserved, for a price in excess of $600,000. This property, which is about seven miles from the Bear Creek property and is adjacent to the Arcadia municipal limits, contains a huge salt dome. The property was acquired for the storage and marketing of liquid hydrocarbons in a hollow cavity created by washing out a portion of the salt. Plaintiff's expert witness explained that the salt dome cavity of 174 acres was well suited for the storage of liquid hydrocarbons (butane and propane) and was 47 times greater in BTU heating capacity per area unit than was the porous rock reservoir. Defendants produced no comparable expert with respect to the suitability or comparability, but relied on its expert appraiser to testify that he considered this as the one comparable sale solely on the face of the public record.
The trial court accepted defendants' witness as an expert appraiser, but rejected his appraisal based on market value determined solely by the Enterprise sales price. Defendants' assignment 8 asserts that this was error. We cannot agree. A trial court has great discretion in accepting and weighing expert testimony to determine just compensation. In the absence of a showing of manifest error and where the determination is reasonably supported by expert evidence, the trial judge's determination will be upheld on appeal. City of Shreveport v. Pupillo, 390 So.2d 941 (La. App. 2d Cir. 1980).

OTHER ASSIGNMENTS
Appellants contend in the remaining assignments 9-12 that the awards are inadequate, that greater rights have been taken than prayed for, that attorney fees and expert witness fees should be increased, and that the evidence proffered should negate the public and necessary purpose of the expropriation and the awards as being just compensation. Except for the quantum of the fees and the just compensation issues, the thrust of these assignments have been considered under the heading "Assignments 1-6", and have been found to be without merit.
We reiterate that for expropriation of an underground reservoir for natural gas storage, the statute requires only that the petitioner show express approval of the Commissioner, good faith negotiation, and the public and necessary purpose of the expropriation. Whether or not the reservoir is capable of producing oil and in paying quantities, whether or not three-fourths of the owners in interest have agreed to the reservoir being used for the storage of natural gas, whether or not the reservoir is suitable and feasible for the storage of natural gas, and all other determinations set forth in LRS 30:22B which are required to be made by the Commissioner, are matters to be contested before the Commissioner or in an action against the Commissioner, and are not before the court in an expropriation action. The proffered evidence could possibly be weighed and construed by the Commissioner or by a court having jurisdiction to negate a Commissioner's order, as grounds to modify or reverse the Commissioner's approval of the use of the reservoir for the storage of natural gas. But neither the lower court nor this court has authority to modify or reverse the Commissioner's order approving this reservoir for the storage of natural gas on any evidence, including *666 that of fraud, as is alleged by defendants.[4] Assignment 12 presents no error.
The rights expropriated here include the storage right, here belonging to the landowners, the servitude on the surface for the laying of pipelines and other facilities for the operation of the project, also belonging to the landowners, and the right to participate in the production of the remaining recoverable natural gas and condensate in the reservoir, belonging to either or both the land and the mineral right owners. These rights are not greater than the expropriation statutes or than the expropriation petition sets forth. Assignment 10 presents no error.
Assignment 11, with respect to the amount of attorney fees awarded, will be discussed under the general heading, "Attorney Fees". Assignment 11 also complains that defendants' appraiser was not allowed an expert witness fee. In these matters, the trial court is vested with great discretion and is authorized to disallow expert fees to witnesses whose testimony is found to be valueless. Louisiana Intrastate Gas Corp. v. Guidry, 357 So.2d 830 (La.App. 3d Cir. 1978), writ refused, Assignment 11 presents no error in this respect.

QUANTUM OF AWARDS
Appellants do not contest the amount awarded for the recoverable gas and condensate, but do contend that the award for storage rights and surface servitude should be increased from $285 per acre to $3500 per acre, the value estimated by defendants' appraiser and rejected by the trial court. See Assignment 8, supra. We reiterate that there are three distinct categories of rights taken, the right to the recoverable gas and condensate, the servitude of use of the surface, and the right to the use of the underground reservoir for storage of natural gas. Each defendant owns one or more of these rights. We show the amount of the award in each category and the highest amount that was offered by plaintiff in each appeal.

APPELLATE
DOCKET NO. STORAGE SURFACE MINERAL TOTAL HIGHEST
AND NAME RIGHTS RIGHTS RIGHTS AWARD OFFER 
# 14,671
Jordan, et al $37,050.54 $6,155.67 N/A $43,206.21 $50,016.00
Perkins 8,550.00 1,758.75 N/A 10,308.75 12,165.00
# 14,672
# 14,673
# 14,676
William T. and
Jewel Lowrey 53,915.00 41,580.00 412.63 95,907.63 75,364.00
# 14,674
# 14,679
Bill Sutton,
et al 11,400.00 N/A 401.52 11,801.52 12,950.00
# 14,674
# 14,678
Larry and
Judith Sutton 45,372.50 1,540.00 N/A 46,912.50 42,587.00
# 14,674
Steven and
Darlene Sutton 44,887.50 1,540.00 N/A 46,427.50 42,122.50
# 14,675
Elmer and
Ella Walker 1,425.00 100.00 N/A 1,525.00 1,190.00
# 14,677
Grace Douglas 210.50 N/A N/A 210.50 255.00

*667 A trial court's determination of market value made from and reasonably supported by competent expert testimony will be upheld on appeal. The appellate court will review the record to decide whether the trial court's factual determination is reasonably supported by evidence. City of Shreveport v. Pupillo, supra. The testimony of plaintiff's experts constitutes competent expert testimony and reasonably supports the lower court's value determination.[5] Assignment 9 presents no error.

ATTORNEY FEES
If the highest amount offered by the expropriator is less than the compensation awarded to the owner of the property right expropriated, LRS 19:8 provides that the court may award reasonable attorney fees. Abuse of discretion in assessing the award, and its reasonableness, can only be determined by the circumstances of the individual case. See City of Shreveport v. Pupillo, supra. Defendants complain the award is too low. Plaintiff complains that the award is too high. Each litigant contends that the trial court manifestly erred and abused its discretion.
State v. Ransome, 392 So.2d 490 (La.App. 1st Cir. 1980), set forth 10 factors which might be considered in determining an award of attorney fees. These factors include the intracacies of the facts and law involved, the diligence and skill of counsel, the number of appearances made, the extent and character of the labor performed, the amount involved, the importance of the litigation, and the trial court's knowledge of the services.
Attorney fees were awarded in six cases. The excess awarded over the total offered in these six cases was $29,910.65. The attorney fees awarded in these cases totaled $39,207.06.[6] While this case is important to these litigants and shows some of the ingenuity of defendants' counsel, only those issues that are common to expropriation actions under LRS Titles 91 and 30 are presented. Much of the time and effort of defendants' counsel was expended on issues which have been settled by legislative act or by court decision prior to this litigation. The constitutional issue of broadness beyond title was settled in Sanchez. The jurisdictional authority to assail orders of the Commissioner of Conservation was made in Act 190 of 1962 (now LRS 30:22) and has been settled by numerous court decisions since that time. The market value method of determining value, with consideration of the factors of cushion gas remaining in the reservoir, special adaptability of the reservoir for storage, and the effect of the completed reservoir on future exploration for minerals at greater depths, was approved in Sanchez and more recently by this court in Trunkline Gas Co. v. Rawls, cited supra.
In Rawls, the appraiser for the defendant owners used these factors and the trial court awarded $21,568, using this appraisal over the $2,785 appraisal of the plaintiff gas company. We affirmed, emphasizing that the determination of value must be made on the basis of the facts and the uniqueness of the thing taken in each individual case. We increased the award of attorney fees in Rawls from $2,500 to $6,200 on the factor of the difference of the amount offered and the amount awarded, analogizing LRS 19:8 to LRS 48:453(E).[7] *668 Considering the several Ransome factors, and particularly the total amount of the award over the total offered and the character and extent of the labor performed on the crucial issue of just compensation, we find the amount awarded as attorney fees to be unreasonable and an abuse of discretion. We shall amend the award in each case to reduce the attorney fee award which is more broadly in line with Rawls and the approach taken there. The fact that several cases were consolidated benefits defendants' counsel because of the commonality of issues in each category of rights taken.

CONCLUSION
The remaining twelfth assignment of appellants presents no error. The proffered evidence that the Pettit Zone reservoir contains two separate zones and is capable of producing greater commercial quantities of oil and gas than was fraudulently represented to the Commissioner of Conservation by plaintiff, is relevant to issues triable before or against the Commissioner at the Commissioner's domicile in East Baton Rouge Parish. LRS 30:22(B), § 12, § 6(F). Defendants' own witness in the proffer stated that he did not disagree with the Commissioner's order as to the estimated quantity of gas and condensate in the reservoir. The trial court noted that defendants did not "follow through" on the trial court's offer to hear the proffered witnesses' testimony as evidence bearing on the issue of just compensation.
Appellee's complaint about being assessed with costs does not present error.
In its letter to each defendant before the expropriation action was filed, plaintiff stated:
"Southern Natural is hereby contacting each of you in a good faith effort to reach agreement on the acquisition of the storage rights needed for the development and operation of the reservoir. In this regard it previously offered [you] as compensation...
"The company's offer in this regard was refused. Because of Southern Natural's desire to avoid additional litigation, the offer for the acquisition of these rights was increased to ... an amount greatly exceeding the fair market value of the storage rights. * * *
"Southern Natural is entitled under law to bring an expropriation proceeding before a court of proper jurisdiction to obtain the necessary gas storage rights discussed above if it is unable, after good faith negotiations, to acquire the needed rights by agreement. Furthermore, state law provides that the property owners will be assessed costs of the expropriation proceedings if it is ultimately determined that Southern Natural has tendered at least the true value of the property rights sought to said owners before proceeding to a judicial expropriation."
LRS 19:12 provides:
"If a tender is made of the true value of the property to the owner thereof, before proceeding to a forced expropriation, the costs of the expropriation proceedings shall be paid by the owner."
This court has held that because the assessment of costs relates directly to the owner's right to just compensation, LRS 19:12 must be strictly construed. Louisiana Gas Purchasing Corp. v. Sincox, 368 So.2d 816 (La.App. 2d Cir. 1979). Other cases have suggested an analysis of the issue of assessment of costs in expropriation actions by distinguishing between actual tender and offer of true value of the property and whether the evidence revealed that an actual tender would have been to no avail and vain and useless. Louisiana Resources Co. v. Fiske, 356 So.2d 110 (La.App. 3d Cir. 1978).
Here the trial court assessed costs to the plaintiff only in those cases where attorney fees were awarded. We note that the test for assessing attorney fees is the highest offer test of LRS 19:8, while the test for assessing costs is the tender of true value test of LRS 19:12. While the trial court made no express findings about the tender test, we must view the record most favorably towards upholding *669 the judgment, but must construe the statute in favor of the property owner and strictly against the expropriator because the statute is in derogation of the rights of the property owner. In this respect, however, we cannot construe § 12 tender identically with § 8 offer, and we find that the offer here was not any stronger than in Sincox, supra, where we held that an offer of the identical amount awarded by the court was not equivalent to a § 12 tender for the purposes of assessing costs. In Sincox the expropriator there mailed to the owner of the right a draft for the property right that was eventually expropriated, accompanied by a conveyance instrument, which, if executed, would have conveyed that right to the expropriator.[8] Accordingly, we amend the judgment in each case to assess costs to plaintiff.

DISPOSITION
All judgments appealed are amended to cast plaintiff with costs.
In these appellate docket numbers the judgments are amended to reduce attorney fees as is shown:

 TOTAL ATTY.
DOCKET EXCESS AWARD FEE REDUCED AMENDED
NOS. OVER OFFER FROM and TO 
14,672
14,673
14,676 $20,543 $29,320 $7,000
14,674
14,678 $ 9,032 $ 6,887 $2,850
14,675 $ 335 $ 3,000 $ 150

As amended, and at appellee's cost, judgment in each case is AFFIRMED.
NOTES
[1] This reservoir is porous limestone called the Pettit Zone at a depth of 6968-7080 feet underlying about 13,000 surface acres in the Bear Creek Field about 7 miles south of Arcadia, seat of Bienville Parish.
[2] Defendant in our docket No. 14,671, Charlie W. Jordan, has questioned the validity of the Commissioner's Order in an action against the Commissioner in East Baton Rouge Parish. That action is yet pending. See Jordan v. Sutton, 401 So.2d 389 (La.App. 1st Cir. 1981). Jordan is represented in that action by the same counsel in this appeal and some of the issues raised there are raised here.
[3] The log in appellate docket nos. 14,672 and 14,673, for instance, shows that plaintiff's agents contacted defendant William Travis Lowrey on these occasions before suit was filed:

"DATE: August 30, 1978
"OFFER: $10,960 for Option Agreement with a portion payable upon execution of the Agreement and the balance due upon exercise of the Option by Southern Natural Gas Company. * * *
"DATE: October 26, 1978
"OFFER: $13,334 for an Option Agreement with a portion payable upon execution of the Agreement and the balance due upon exercise of the Option. Additionally, an offer of $800 per acre for permanent rights-of-way, the number of acres to be determined immediately upon completion of the installation of such surface facilities. * * *
"DATE: December 21, 1978.
"OFFER: $28,050 for an Option Agreement with $800 per acre for permanent well sites and rights-of-way acreage. * * *
"DATE: April 4, 1979
"OFFER: $28,050 (It is noted that the Agent was supposed to have increased the offer at this time; however, this was not done.) * * *
"DATE: August 6, 1979
"OFFER: $68,680 total payable in full upon execution of the Agreement. This offer was based on an ownership of 189.169 surface acres, 48.563 mineral and royalty acres, 1.355 MCF gas, 9.207 barrels of condensate together with the anticipated use of 8 acres permanent well sites and rights-of-way at $1,500 per acre and 7 acres of temporary workspace at $750 per acre.
"COMMENTS: Mr. Lowrey maintained his same position as previously stated in that he does not desire to sell and convey any property rights but would be willing to discuss terms for a lease of the desired storage rights. He further objected to the right to drill water wells as deemed necessary, contending that an overabundance of such wells might lower present water tables. Mr. Lowrey indicated he might consider leasing specified water rights along the same lines that he would consider leasing storage rights. During the course of this meeting, an offer was presented to Mr. Lowrey in the amount of $1,200 per acre for the purchase of 7.18 acres of land adjacent to the existing Southern Natural Gas Company station site at Bienville. Prior attempts to purchase this property before the acquisition of storage rights had been unsuccessful. It was the desire of Southern Natural to purchase 5.57 acres, but due to the configuration and lay of the land, they were willing to purchase an additional 1.61 acres as well. Mr. Lowrey stated that he had attempted to negotiate a deal with Southern Natural earlier and that they had not seen fit to consider his terms; therefore, he saw no reason to consider or discuss this property further. Mr. Lowrey was advised that this was our final contact as well as our final attempt to purchase the desired storage rights."
[4] See footnote 2.
[5] See section on "Just Compensation."
[6] DOCKET AMOUNT AMOUNT ATTORNEY
 NUMBER OFFERED AWARDED FEES 
 14,672
 14,673
 14,676 $75,364.00 $95,907.63 $29,320.00
 14,674
 14,678 $84,709.50 $93,340.00 $ 6,887.06
 14,675 $ 1,190.00 $ 1,525.00 $ 3,000.00

[7] "Reasonable attorney fees may be awarded by the court if the amount of the compensation deposited in the registry of the court is less than the amount of compensation awarded in the judgment. Such attorney fees in no event shall exceed 25% of the difference between the award and the amount deposited in the registry of the court."
[8] In Sincox we upheld a judgment equivalent to the highest amount offered the owner even though the only expert testimony was that the fair market value was less than the offer. The offer there was not said to be in "excess" of market value and was not conditioned or made "to avoid additional litigation" as it was here. See Southern Natural's letter to owners, quoted supra.